JOSEPH A. FALCON-FREEMAN, SBN 318601
Homeless Action Center
2601 San Pablo Avenue
Oakland, CA 94612
Phone:      (510) 695-2260 x 318
Facsimile: (510) 858-7867
jfalcon-freeman@homelessactioncenter.org


Attorney for Plaintiff Sean Patrick Micco

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sean P. Micco, <br><br> Plaintiff, <br><br> v. <br><br> Commissioner of Social Security, <br><br> Defendant. | CASE NO. 3:18-cv-05513-SK <br><br><br> PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES |

## I.    <u>INTRODUCTION</u>

Plaintiff hereby moves for summary judgment, reversal of the Commissioner's final decision, and remand.  This action is filed according to Civil L.R. 16-5, and as such, it is submitted on the papers without oral argument. Plaintiff moves for summary judgment, reversal of the Commissioner's final decision, and remand of this case in accordance with sentence four of 42 U.S.C. § 405(g).

## II.   TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.   TABLE OF CONTENTS ............................................................................................ 2

III.  TABLE OF AUTHORITIES ....................................................................................... 3

IV.  ISSUES ................................................................................................................... 4

V.   PROCEDURAL HISTORY ........................................................................................ 4

VI.  STANDARD OF REVIEW ......................................................................................... 4

VII. LEGAL STANDARD ................................................................................................. 5

VIII. FACTUAL BACKGROUND ....................................................................................... 5

IX.  SUMMARY OF MEDICAL EVIDENCE ...................................................................... 6

   A.   PSYCHIATRIC OUTPATIENT TREATMENT ............................................................ 6

   B.   PSYCHIATRIC HOSPITALIZATIONS ..................................................................... 7

   C.   DECEMBER 2016 PSYCHOLOGICAL EVALUATION ............................................... 8

   D.   PLAINTIFF'S FUNCTIONAL ABDOMINAL DISORDER ............................................. 8

X.   ARGUMENT ............................................................................................................ 9

   A.   THE ALJ ERRED IN WEIGHING THE MEDICAL OPINION EVIDENCE ...................... 9

   B.   THE ALJ ERRED IN DISCREDITING CLAIMANT'S SYMPTOM TESTIMONY WITHOUT PROVIDING CLEAR, CONVINCING, AND SPECIFIC REASONS ................................................................................... 15

   C.   THE ALJ ERRED IN DISREGARDING THE LAY TESTIMONY OF MELINDA MICCO WITHOUT PROVIDING GERMANE REASONS ............................................................................................................ 16

   D.   THE ALJ ERRED IN FINDING PLAINTIFF'S ABDOMINAL DISORDER NOT SEVERE ............... 18

   E.   THE ALJ ERRED BY FORMULATING A RESIDUAL FUNCTIONAL CAPACITY THAT DID NOT INCLUDE ALL IMPAIRMENTS 20

   F.   THE COURT SHOULD REMAND FOR PAYMENT OF BENEFITS .......................... 24

XI.  CONCLUSION ....................................................................................................... 25

## III.   TABLE OF AUTHORITIES

**Cases**

*Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Bustamante v. Massanari*, 262 F.3d 949 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Dodrill v. Shalala*, 12 F.3d 915 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Garrison v. Colvin,* 759 F.3d 995 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

*Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Leon v. Berryhill, 880 F.3d 1041 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Lester v. Chater*, 81 F.3d 821 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 16

*Light v. Soc. Sec. Admin.*, 119 F.3d 789 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Magallanes v. Bowen*, 881 F.2d 747 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21

*Matthews v. Shalala*, 10 F.3d 678 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*McCartey v. Massanari*, 298 F.3d 1072 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nguyen v. Chater,* 100 F.3d 1462 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Pitzer v. Sullivan,* 908 F.2d 502 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Reddick v. Chater*, 157 F.3d 715 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17

*Richardson v. Perales*, 402 U.S. 389 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Robbins v. Soc. Sec. Admin*, 466 F.3d 880 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*See Leon v. Berryhill*, 880 F.3d 1041 at 1046 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sims v. Apfel*, 530 U.S. 103 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19

*Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . 17

*Tacket v. Apfel,* 180 F.3d 1094 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Thomas v. Barnhart*, 278 F.3d 947 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Vasquez v. Astrue*, 572 F.3d 586 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Statutes**

42 U.S.C. § 405(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24, 25

42 U.S.C. § 423 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 416.935 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Regulations**

20 C.F.R. § 404.1513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20 C.F.R. § 416.920. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 C.F.R. §404.1527 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

20 C.F.R. Part 404, Subpart P, App. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 23

## IV.  ISSUES

Plaintiff appeals the decision of the Commissioner of Social Security that he is not disabled within the meaning of Titles II and XVI of the Social Security Act. The issues presented are:

1) Did the ALJ err in evaluating the medical opinions?

2) Did the ALJ err in determining Plaintiff's testimony was not credible without providing clear, convincing, and specific reasons supported by substantial evidence?

3) Did the ALJ err in discounting the lay testimony of Melinda Micco without providing a germane reason?

4) Did the ALJ err at step two of the sequential evaluation process by finding Plaintiff's abdominal disorder non-severe?

5) Did the ALJ err at step five of the sequential evaluation process by failing to include all of Plaintiff's conditions in his residual functional capacity?

## V.  PROCEDURAL HISTORY

Plaintiff protectively filed disability claims under Title II and Title XVIII of the Social Security Act on July 11, 2014. (AR 228). He alleged that he became disabled on January 31, 2012. (AR 230).  Plaintiff's claims were denied in an undated notice apparently issued in early 2015. (AR 145). He requested reconsideration on April 3, 2015. (AR 150). On June 11, 2015, his claim was denied again upon reconsideration. (AR 153). Plaintiff timely requested an administrative hearing, which took place before Administrative Law Judge (ALJ) Cheryl Tompkin on March 3, 2017. (AR 43, 160). The ALJ denied Plaintiff's claims in a hearing decision dated June 27, 2017. (AR 19). Plaintiff timely requested Appeals Council review, and the Appeals Council declined. (AR 1, AR 225). This action follows.

## VI.  STANDARD OF REVIEW

The Commissioner's decision may be reversed if it is "based on legal error or not supported by substantial evidence. *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). In applying this test, the whole record is examined, including the evidence that both supports and detracts from the Commissioner's decision. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). A claimant seeking judicial review has not waived any issues that were not raised in a request for review by the Appeals Council. *Sims v. Apfel*, 530 U.S. 103, 107-110, 120 (2000).

## VII.  LEGAL STANDARD

Disability under the Social Security Act is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Federal regulations require the use of a five-step sequential evaluation process to determine if the claimant is disabled: (1) is the claimant currently engaged in substantial gainful activity? If yes, not disabled; if no, (2) is the claimant suffering from a severe impairment? If no, not disabled; if yes, (3) is the impairment the same or as severe as any of the impairments in the "Listings" of Appendix 1 to Subpart P of 20 C.F.R. § 404? If yes, disabled; if no, (4) does the claimant retain the ability to perform his/her past relevant work? If yes, not disabled; if no, (5) does the claimant retain the ability to perform other work that exists in significant numbers? If no, the claimant is disabled; if yes, the claimant is not disabled. 20 C.F.R. § 416.920.

## VIII. FACTUAL BACKGROUND

Plaintiff Sean Micco, thirty-four and a resident of Oakland, California, has a long history of severe mental illness. (AR 965). He has been diagnosed with bipolar disorder (AR 422), personality disorder with narcissistic and borderline traits (AR 759), and schizoaffective disorder, bipolar type (AR 970). From 2012 until at least November 2015, Plaintiff also suffered from an unspecified abdominal disorder that caused repeated hospitalizations due to intractable nausea, vomiting, and abdominal pain. (AR 665, 806).

Although there are times when Plaintiff is "fairly balanced" and seems capable of taking care of himself, he frequently experiences periods of deep depression or debilitating

mania. (AR 56). When Plaintiff is very depressed, he finds it "difficult to do anything," and his mother noted that he may not leave bed even to eat. (AR 56, 313). During these times he becomes "apathetic" and feels that putting forth effort is "pointless." (AR 966). In contrast, when Plaintiff is manic or hypomanic, he finds it "difficult to focus or pay attention to what needs to be done" because he has "racing thoughts" that "make[] it very difficult to complete any tasks." (AR 57). In general, Plaintiff "[t]ends to be very productive for short bursts and [but] then he may not be able to get out of bed for two weeks." (AR 966).

Plaintiff last worked in 2012 at an auto-repair shop. (AR 52). At that job, his employer introduced Plaintiff to cocaine, which he felt made him "more capable of work" but began to "destroy" his mental health. (AR 60, 966). Plaintiff eventually left that job after almost assaulting a coworker with a heavy metal bar. (AR 53). The altercation that led Plaintiff to leave his employment is one of a string of episodes of aggressive behavior in response to quotidian stresses, including an arrest and serious injury after fighting a neighbor and repeated evaluations and holds for involuntary psychiatric care due to aggressive behavior. (AR 393, 894, 464, 848). Plaintiff testified that a single negative interaction can send him spiraling, as he gets "caught up on" a comment and can't let it go, leading him to feel, "basically, out of control – or my emotions and my behavior gets out of control because I get so frustrated." (AR 61-62).

## IX.    SUMMARY OF MEDICAL EVIDENCE

### A.    Psychiatric Outpatient Treatment

From September 2013 until June 2015, Plaintiff received outpatient psychiatric treatment by the Oakland Adult Service Team of Alameda Behavioral Health Care. (AR 405-457; 467-486, 960-969). In September 2013, Dr. Giridhar Reddy, M.D., diagnosed Bipolar Disorder, most recent episode mixed, along with alcohol abuse and cannabis abuse. (AR 423). Dr. Reddy prescribed Lithium Carbonate 300 mg. (AR 423). Plaintiff met with Dr. Reddy at least five times between September 2013 and January 2014. (AR 423, 428, 437, 442, 448). In early 2014, Dr. Reddy left the program and Plaintiff began to be seen by Dr. John Champlin, M.D., who he saw in March, May, and August of 2014. (AR 455, 409, 420). At that point, Plaintiff's Lithium had increased to 300 mg in the morning and another 600 mg Lithium in the

evening. (AR 410). Unfortunately, the treatment notes of Dr. Reddy and Dr. Champlin are difficult to parse because they barely change from visit to visit. (Compare AR 411, 417-418, 428-429, 436-437, 442-443, 448-449, 454-455). By October 2014, Plaintiff's care had again been transferred, this time to Dr. Amanda Bachuss, M.D. (AR 467). Dr. Bachuss noted that Plaintiff was irritable and hostile, with narcissistic traits, and she continued Plaintiff on Lithium. (AR 474).  In June 2015, Dr. Bachuss noted that some days Plaintiff "feels good" but other days he feels "worthless." (AR 758). When asked if he experienced auditory hallucinations, Plaintiff laughed and said, "I'm not going to say so in a place like this." (AR 759). Regarding suicidality, Plaintiff stated "If I wanted to kill myself, I'd be sneaky about it and no one could stop me." (AR 759). Dr. Bachuss offered diagnoses of depression, cannabis abuse, alcohol abuse, and an Axis II personality disorder with narcissistic and borderline traits. (AR 759). Plaintiff had discontinued taking Lithium and did not wish to resume. (AR 759).

**B.    Psychiatric Hospitalizations**

Plaintiff has been evaluated for involuntary psychiatric hospitalization at least three times during the claim period. In June 2014, Plaintiff was placed on a "5150" psychiatric hold by Oakland Police after he began to panic and become aggressive at home. (AR 894). The hold was not continued, and so Plaintiff did not have to go to the psychiatric hospital. (AR 894). He was not so lucky a few months later, in October 2014, when Plaintiff was brought involuntarily to John George Psychiatric Hospital after yelling, screaming, throwing things, and threatening to kill himself. (AR 464). At the time, Plaintiff was engaged in outpatient treatment and taking Lithium, Protonox, and Zofran. (AR 464).

Most recently, Plaintiff was held at John George Psychiatric from January 17 2017, to Januar 18, 2017. (AR 848). Plaintiff had become extremely upset while on the way to visit his ailing ninety-nine-year-old grandmother. (AR 848). He began to bang on his mother's car, threatened to kill his mother, and threatened to burn down his mother's and neighbor's homes. (AR 848). Upon being brought to the psychiatric hospital, Plaintiff walked out during his clinical interview and displayed paranoid ideas that people were laughing at him. (AR 848). Dr. Jennifer McQuade, M.D., found Plaintiff to be experiencing "acute manic decompensation of

bipolar disorder," characterized by irritability, increased goal-directed activity, impulsivity, and poor insight into his mental illness. (AR 856).

**C.     December 2016 Psychological Evaluation**

Plaintiff was examined by psychologist Dr. Lesleigh Franklin, PhD, on December 28, 2016, and Dr. Franklin offered an eight-page report discussing Plaintiff psychological functioning. (AR 965-972). Dr. Franklin reviewed available records from Plaintiff's treating providers at Alameda Behavioral Healthcare and records of Plaintiff's psychiatric hospitalizations. (AR 965). In addition to reviewing records, Dr. Franklin also conducted a clinical interview and administered the Mini Mental State Examination, the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) – Form A, and Trail Making A & B test. (AR 965).

Dr. Franklin found that Plaintiff had impaired attention on formal measures and worked at a rate that was slow as compared with peers. (AR 967). He was able to sustain attention well enough to remember short strings of information but displayed significant delayed and immediate memory problems. (AR 967). He displayed depressed mood. (AR 967). On the RBANS, Plaintiff received a standard score of 64, placing him "in the 1st percentile and in the Extremely Low range." (AR 969). Dr. Franklin described "notable problems with language, visuospatial abilities, immediate memory, delayed memory, attention and concentration, and executive functioning." (AR 969).

Based on her assessment, Dr. Franklin offered diagnostic impressions of Schizoaffective Disorder, Bipolar Type, and Other Substance Use Disorder. (AR 970). Dr. Franklin opined that Plaintiff displayed "marked" or "extreme" impairments in six domains of work-related functioning, including working at a consistent pace without an unreasonable number of breaks, getting along and working with others, and completing a workday and workweek without interruptions from psychologically based symptoms. (AR 972).

**D.     Plaintiff's Functional Abdominal Disorder**

From before Plaintiff's alleged onset of disability of January 31, 2012, through at least the end of 2015, Plaintiff suffered from an abdominal disorder that caused nausea, cyclical

vomiting, chronic abdominal pain, and repeated trips to the emergency room ("ER"). (*e.g.*, AR 360, 377, 381). In November 2014, he was held overnight at the hospital with intractable nausea, vomiting, and diffuse abdominal pain. (AR 505). He presented to the ER with similar symptoms on December 8, 2014. (AR 831). In January of 2015, Plaintiff was evaluated by specialist Dr. Taft Bhuket, M.D., at Highland Hospital's gastrointestinal clinic. (AR 665). Plaintiff reported four to five years of nausea, vomiting, and abdominal pain with intermittent constipation. (AR 665). The symptoms were always present but periodically became so severe that he would go to the ER. (AR 666). Contrary to a differential diagnosis of "cannabinoid hyperemesis" offered by an emergency room doctor, (AR 631), Plaintiff reported that his symptoms persisted through a long period of abstinence from marijuana. (AR 667). Dr. Bhuket noted that Plaintiff's condition was "lifestyle limiting and persistent" and offered a provisional diagnosis of "functional abdominal disorder." (AR 668). Plaintiff continued to make regular emergency room visits due to this condition throughout 2015, including on February 23, 2015 (AR 657), February 26, 2015 (AR 625), March 19, 2015 (AR 558), April 21, 2015 (AR 604), July 31, 2015 (AR 548), November 1, 2015 (AR 716), and November 3, 2015 (AR 806).

## X.   ARGUMENT

### A.   The ALJ Erred in Weighing the Medical Opinion Evidence

The ALJ erred by giving greater weight to the opinions of two state agency consultants who did not examine Plaintiff (and who only reviewed records up to January 2015) than she gave to the opinions of psychologist Dr. Lesleigh Franklin, PhD, who conducted a clinical interview and administered psychological testing, in addition to reviewing records through December 2016.  (AR 106, 122, 965).

The regulations and caselaw distinguish between the opinions of examining and non-examining sources, with "more weight" generally given to "the opinion of a medical source who has examined you than to the medical opinion of a medical source who has not examined you." 20 C.F.R. §404.1527(c)(1); *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995). To justify rejecting an examining sources' uncontradicted opinion, an ALJ must provide "clear and convincing" reasons. *Lester*, 81 F.3d at 831. Even where an examining provider's opinion is

contradicted, discounting the opinion requires that the ALJ provide "specific and legitimate" reasons based on substantial evidence in the record. *See Lester v. Chater*, 81 F.3d at 831 ("[L]ike the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.") Further, the opinion of a non-examining physician cannot by itself constitute the substantial evidence that justifies the rejection of the opinion of an examining physician. *Id.* at 831 (citing *Pitzer v. Sullivan,* 908 F.2d 502, 506 (9th Cir. 1990)). In cases where the opinion of a non-examining physician justified rejection of the opinion of an examining physician or a treating physician, there has been "an abundance of evidence that supported the ALJ's decision," in addition to that opinion. *Id.*

i.   *The ALJ Erred in Giving Limited Weight to the Opinions of Examining Psychologist Lesleigh Franklin, PhD*

Dr. Lesleigh Franklin, PhD, examined Plaintiff on December 28, 2016. (AR 965). Her examination consisted of a clinical interview, objective psychological testing, and a review of medical records from Plaintiff's treating providers and psychiatric hospitalizations. (AR 965). Based on her examination, Dr. Franklin offered a diagnostic impression of Schizoaffective Disorder (Bipolar Type) and Other Substance Use Disorder. (AR 970). She opined that Plaintiff had "marked" or "extreme" impairments in six key domains of work-related functioning, including working at a consistent pace without an unreasonable number and length of breaks, getting along and working with others, dealing with normal work stressors, and completing a normal workday and workweek without interruptions from psychologically based symptoms. (AR 972).

The ALJ substantially discounted Dr. Franklin's evaluation, finding it to be "overly restrictive." (AR 31). The ALJ provided two justifications for this finding: (1) Plaintiff's mental health treatment was allegedly "limited and inconsistent," apparently implying his impairments were not as serious as assessed by Dr. Franklin, and (2) the severity of the limitations offered by Dr. Franklin were allegedly inconsistent with Plaintiff's work history, "i.e., that he left his prior jobs voluntarily after working for extended periods." (AR 31).

Neither reason constitutes a "specific and legitimate" justification for discarding Dr. Franklin's opinion. *Lester*, 81 F.3d at 831.

First, regarding Plaintiff's "limited and inconsistent," treatment, Plaintiff was in outpatient psychiatric care from September 2013 to June 2015. (AR 405-457, 467-486, 960-969). He testified that the psychotropics he was taking were not effective at managing his bipolar symptoms but did cause serious physical side effects. (AR 68). In particular, the record suggests that Lithium exacerbated Plaintiff's debilitating nausea, causing "stomach upsets." (AR 312). In June of 2014, Plaintiff reported nausea upon taking his medications. (AR 898). In January 2015, Plaintiff's primary care doctor Rachel Fogel, M.D., noted that his nausea and vomiting had improved since stopping Lithium, and hypothesized that there was an association. (AR 575). Given that Plaintiff's medications were not controlling his symptoms but were causing side effects, it is not reasonable to draw an inference of a lack of severity from the fact that he discontinued those medications.

Moreover, assuming *arguendo* that Plaintiff did exercise poor judgement in failing to maintain treatment, the Ninth Circuit has emphasized that a claimant's failure to sufficiently seek or comply with treatment does not contradict allegations that she suffers from severe mental illness, criticizing "the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir.1996) (internal quotation marks and citation omitted). Plaintiff demonstrates poor insight and judgement regarding his own mental illness, for example telling his psychiatrist that although he had repeatedly been to John George Psychiatric Hospital, it was because "people are trying to 'f--- with me,'" and not due to his bipolar symptoms. (AR 474). According to the Plaintiff's mother, he is often unable to ask for help when needed. (AR 408). To the extent Plaintiff has not complied with treatment, such a failure reflects limitations caused by his symptoms and should not be held against him.

The ALJ's second basis for disregarding Dr. Franklin's report is also not legitimate. The ALJ misconstrued Plaintiff's testimony by stating that he left his previous employment

"voluntarily" and not at least in part due to his psychological symptoms. (AR 31). Plaintiff testified that he once worked for a few months at a delicatessen in Seattle but became extremely depressed and "basically left because I felt suicidal . . . basically like I wasn't going to make it if I kept going." (AR 55). Plaintiff then testified that he subsequently worked at a car repair shop. (AR 52). While working there, his employer introduced him to cocaine, which improved Plaintiff's performance. (AR 54). The cocaine made Plaintiff "more capable of work" but was "destroying [him] personally." (AR 60). Plaintiff eventually had an altercation where he almost assaulted a coworker with a large metal bar. (AR 53). He left the job soon after, later telling his primary care doctor that he couldn't handle the stress. (AR 597). In both situations, Plaintiff did not leave employment "voluntarily," but rather lost jobs precisely as a result of the behavioral and emotional problems that form the basis of his claim for disability.

ii.    *The ALJ Erred in Giving "Great Weight" to the Opinions of State Agency Consultants Who Never Examined Plaintiff*

State agency psychological consultants Hillary Weiss, PhD, and Uwe Jacobs, PhD, offered internal administrative opinions regarding Plaintiff's functioning at the initial and reconsideration stages of Plaintiff's claim, respectively. (AR 106, 122). At the initial stage, in January of 2015, Dr. Weiss assessed that Plaintiff had "moderate" impairments across a wide-range of work-related areas of functioning, including maintaining attention and concentration, performing within a schedule and maintaining attendance, completing work without interruption from psychological symptoms, interacting appropriately with the public, accepting instructions and feedback, getting along with coworkers or peers, and responding to changes in the workplace. (AR 93-94). Despite these limitations, the consultant opined that, overall, if Plaintiff was sober and medication-compliant, then he would be "capable of [concentration, persistence, and pace] for simple tasks w[ith] [no public contact]." (AR 106). Dr. Weiss did not examine Plaintiff and her opinion is based solely on a review of the then-available medical records. In June of 2015, Uwe Jacobs, PhD, who also did not examine Plaintiff, offered the following one-sentence concurrence: "Reconsideration review remains consistent with initial analysis and severity rating [as provided by Dr. Weiss]." (AR 122).

The ALJ accorded "great weight" to the opinions of these state agency consultants, for the stated reason that their opinions were "consistent with the record as a whole, including the treatment records demonstrating that the claimant's symptoms stabilize when he is compliant with treatment." (AR 31). Substantial evidence in the record does not support this conclusory finding. (AR 31).

The ALJ does not spell out her reasoning for finding that "Plaintiff's symptoms stabilize when he is compliant with treatment," nor does she provide pincites to the medical evidence. (AR 31). The ALJ instead cites generally to administrative exhibit "4F," at AR 405-457. (AR 31). The cited treatment notes from Alameda Behavioral Health Care cover the period from September 2013 to December 2014. (AR 405-457). The ALJ presumably refers to treatment notes within that period suggesting that Plaintiff was, for example, "much improved for mood swings," (AR 436) or that he "denied mood swings and has no overt depressive symptoms." (AR 409). The ALJ erred by failing to set out her reasoning with specificity, but moreover she erred by ignoring evidence of continuing impaired functioning despite treatment. (AR 31). The Ninth Circuit has emphasized that in mental health cases such reasoning constitutes error:

> "[S]ymptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances, it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin,* 759 F.3d 995, 1017 (9th Cir. 2014).

Although Plaintiff has enjoyed periods of relatively stable functioning, those periods were cyclically interrupted by "debilitating symptoms." *Id*.

For example, Dr. Giridhar Reddy, M.D., noted on November 26, 2013, that Plaintiff was "much improved for mood swings" and "denied depressive symptoms" after starting Lithium. (AR 436). But barely a week later, on December 4, 2013, Plaintiff confided to his social worker Susie Saechao, ASW, that he was feeling depressed, with no motivation to leave the house, and that he needed help filling his prescriptions. (AR 440). A couple weeks later, on December 17, 2013, Plaintiff's mood had shifted dramatically again, and his social worker

noted that Plaintiff was "cooperative and friendly, making jokes." (444). Such dramatic mood swings are consistent with Plaintiff's bipolar diagnosis and the testimony of his mother that he experienced variance in symptomology with his frequent mood swings. (AR 309-310).

Similarly, psychiatrist John Champlin, M.D., noted on May 30, 2014, that Plaintiff had been taking his Lithium, wasn't having mood swings or overt depressive symptoms, had good sleep and appetite, and was living with his girlfriend and could help with chores. (AR 409). A week later, on June 6, 2014, while still medication-compliant, Plaintiff got in a fight with his neighbor, and ended up going to jail while suffering multiple fractures of his jaw and nose. (AR 395). A week after that, on June 13, 2014, Plaintiff was placed on an involuntary psychiatric hold by Oakland Police after panicking and becoming "aggressive" at home. (AR 894). Just a few months later and while still medication-compliant, Plaintiff was involuntarily committed to a psychiatric hospital during a manic episode after yelling, screaming, and throwing a chair at the wall at home. (AR 459). For the ALJ to focus only on instances of improvement without considering Plaintiff's "[c]ycles of improvement and debilitating symptoms" is error. *Garrison,* 759 F.3d at 1017.

Furthermore, medical treatment notes "must be read in context of the overall diagnostic picture." *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). That a person who suffers from severe psychiatric symptoms "makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Id*. For example, while Dr. Champlin noted a lack of mood swings and overt depressive symptoms on May 30, 2014, and made no explicit reference to Plaintiff's debilitating paranoia, Plaintiff's primary care provider, Dr. Rachel Fogel, noted on the very same day that Plaintiff "doesn't leave house much because nervous about neighbor and other people." (AR 409, 595).

Finally, as discussed *supra*, even if substantial evidence did support a finding that Plaintiff's symptoms improved to the point of non-disability when he was compliant with psychiatric treatment, that finding does not legitimately support an inference that Plaintiff's psychiatric conditions are not disabling. *See Nguyen, 100 F.3d at 1465.*

**B.     The ALJ Erred in Discrediting Claimant's Symptom Testimony Without Providing Clear, Convincing, and Specific Reasons**

Plaintiff provided detailed testimony regarding his severe mental health symptoms and limited functioning. (AR 51-73). The ALJ discredited Plaintiff's testimony with the conclusory boilerplate that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 28). The ALJ provided no explanation for this finding. (AR 28). She erred by failing to offer "specific, clear and convincing reasons" for discrediting Plaintiff's symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 2036 (9th Cir. 2007); *Lester*, 81 F.3d at 834.

The evaluation of a claimant's report of subjective symptoms, such as pain and mental health symptoms, proceeds via a "two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter,* 504 F.3d at 2036 (internal quotation marks and citation omitted). If the claimant meets this threshold requirement, and there is no affirmative evidence of malingering, then the analysis continues to step two. *Id.*

At step two of this analysis, the Commissioner may only reject a claimant's testimony about the severity of her symptoms "by offering specific, clear and convincing reasons for doing so." *Lingerfelter*, 504 F.3d at 1036. *See also Robbins v. Soc. Sec. Admin*, 466 F.3d 880, 883 (9th Cir. 2006) (ALJ "may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). The requirement of specificity means that "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834.

Plaintiff testified that he experiences periods when he is "very depressed and it's difficult to do anything in the day," as well as times when he is manic and it is "difficult to focus or pay attention to what needs to be done" because of "racing thoughts going on in my

mind [that make] it very difficult to complete any tasks." (AR 56-57). He avoided interacting with other people, did not have friends, and did not speak to family besides his mother. (AR 64, 66-67). He testified that he could not cope with the strict expectations of full-time work because "[w]hen I'm in a situation I can't – I feel like I can't leave and I'm feeling trapped like that, it just only – it basically just makes me more agitated and more aggressive if I feel like I'm trapped." (AR 57).  Plaintiff testified that he "tend[s] to get pretty aggressive" when he is confronted with "arbitrary orders" from authority figures. (AR 67). Toward the end of his testimony, the ALJ asked Plaintiff, "So let me just clarify it just to make sure I'm understanding what you're saying. You're saying that you can't work because you – you just get depressed and you don't want to do anything? (AR 69). "I can't do anything," Plaintiff responded. *Id.* "It's not about a want, it's not about a desire, it's about an ability – or a lack of an ability thereof." *Id.* Sometimes "I can't go outside," the Plaintiff continued. *Id.*

The ALJ found that the Plaintiff's symptom testimony met the threshold requirement of the two step analysis, but that his symptom testimony was not credible "for the reasons explained in this decision." (AR 28). In *Dodrill v. Shalala*, the Ninth Circuit held that the ALJ's explanation "that there was little or nothing in the record to support Dodrill's claims" was not sufficiently specific to support an adverse credibility finding. 12 F.3d 915, 918 (9th Cir. 1993). The Court held that the ALJ erred by failing to identify specific facts, and remanded the case with instructions that, "the ALJ must identify such facts or accept [plaintiff]'s testimony." *Id.*

Just as in *Dodrill*, the ALJ here erred by failing to provide any specific reasons for discounting Plaintiff's testimony. 12 F.3d at 918. The ALJ's explanation that Plaintiff was not credible "for the reasons contained in this decision" is exactly the sort of conclusory boilerplate disapproved in *Dodrill*. *Id*. In addition, as the ALJ made no finding of malingering and provided no reason for discrediting Plaintiff's symptom testimony, the ALJ also necessarily erred by failing to provide "clear and convincing" reasons. *Reddick*, 157 F.3d at 722.

## C. The ALJ Erred in Disregarding the Lay Testimony of Melinda Micco Without Providing Germane Reasons

Plaintiff's mother, Melinda Micco, offered a statement describing severe limitations in Plaintiff's ability to conduct his daily activities. (AR 305-314). The ALJ assigned "little

weight" to Ms. Micco's statement "to the extent [it] suggests that the claimant is unable to perform work under the residual functional capacity determined herein." (AR 31). The purported reason for disregarding Ms. Micco's statement is a single alleged inconsistency, but substantial evidence does not support the conclusion that any such inconsistency exists. The ALJ therefore failed to provide "germane" reasons for dismissing Ms. Micco's statement. See Leon v. Berryhill, 880 F.3d 1041, 1046 (9th Cir. 2018).

The "ALJ must consider lay witness testimony concerning a claimant's ability to work*." Stout v. Comm'r of Soc. Sec. Admin*., 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill*, 12 F.3d at 919; 20; C.F.R. § 404.1513(d)(4) & (e); *see also Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) ("Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account.") To discount lay witness testimony, the ALJ must give reasons "germane" to each witness. *See Leon v. Berryhill,* 880 F.3d 1041 at 1046.

Ms. Micco's account of Plaintiff's daily functioning is inconsistent with the ALJ's findings. Ms. Micco reported that since becoming sick with bipolar disorder, Plaintiff did not like going out and had curtailed most enjoyable activities. (AR 313). He could not care for his own cats, had consistently disturbed sleep, and regularly stayed in bed all or much of the day. (AR 313). She reported frequent "mood swings" and that he was "often agitated" (AR 310). His ability to pay attention, follow instructions, and get along with authority figures varied according to his mood. (AR 310-311). On the rare occasions that Plaintiff did leave the house, any small change could sending him spiraling out of control: "if there is a change in the route, a different restaurant, [or] delay in leaving" he would "become completely sidetracked and often want[] to return home immediately. (AR 313-314).

In assigning limited weight to Ms. Micco's statement, the ALJ reasoned that "some of her statements are inconsistent with the overall evidence," but provides only a single example. (AR 31). The only inconsistency alleged was that although Ms. Micco "states that the claimant cannot maintain attention, the claimant was able to complete the psychological testing during his evaluation by Dr. Franklin." (AR 31). This finding is not germane because it both

misconstrues Ms. Micco's statement and ignores that Dr. Franklin in fact found "notable" problems with Plaintiff's ability to maintain attention and concentration. (AR 969).

In response to the direct question of how long Plaintiff could pay attention, Ms Micco stated that it "varies hour by hour and is related to [his] manic or depressive state." (AR 310.) This specific statement as to Plaintiff's intermittent difficulty maintaining attention is not inconsistent with the fact that Plaintiff, on a single occasion, maintained attention long enough to complete psychological testing. Ms. Micco stated that Plaintiff "cannot maintain attention" well enough to cook, but this statement must be in context with Ms. Micco's more specific answer to the question "[f]or how long can the disabled person pay attention?" that Plaintiff's ability to maintain attention "varies by hour" according to his bipolar cycling. (AR 310). When read in its proper context, Ms. Micco's statement is clear that Plaintiff's attention difficulties, as well as many other symptoms, fluctuate with his moods.

Moreover, the ALJ's allegation of an inconsistency is contradicted by the results of the psychological testing performed and the actual conclusions of the testing psychologist. (AR 969, 972). In her report, psychologist Lesleigh Franklin, PhD, described "notable problems" with "attention and concentration," among other limitations. (AR 969). On formal measures, Plaintiff scored in the sixteenth percentile on a brief psychological test to measure attention, the RBANS Attention Index. (AR 969). Dr. Franklin assessed that the Plaintiff did have a moderate impairment in his ability to maintain attention and concentration for two-hour periods. (AR 972). As Dr. Franklin found that Plaintiff did have a significant impairment in his ability to maintain attention, her report accords with rather than contradicts Ms. Micco's statement.

**D.    The ALJ Erred in Finding Plaintiff's Abdominal Disorder Not Severe**

At step two of the sequential evaluation procedure, the ALJ found Plaintiff to have the severe impairments of anxiety and bipolar disorder, but she did not find Plaintiff's abdominal disorder, with associated nausea, vomiting, and stomach pain, to be severe.  (AR 25). Although the ALJ noted Plaintiff's "occasional stomach upset" and "cyclical vomiting," she dismissed those symptoms by noting that he has "less abdominal pain when he is not drinking and

decreases marijuana use" and concluded that Plaintiff did not have a severe abdominal condition. (AR 25).

The step two inquiry for severity is intended to be "a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (9th Cir. 1996). An impairment is severe if it causes more than a minimal impairment in the ability to do work. *Id.* The ALJ must consider the combined effect of all the claimant's impairments on his or her ability to function. *Id.* at 1289-1290.

Plaintiff reported his ongoing chronic nausea and vomiting to Dr. Rachel Fogel, M.D., and Dr. Giridhar Reddy, M.D., in December 2013 (AR 442, 597). Dr. Fogel later offered a clinical diagnosis of gastroesophageal reflux disease. (AR 583). Plaintiff repeatedly complained of and sought treatment for his symptoms. (AR 408, 411, 475, 597, 589, 583, 574). He was hospitalized with intractable nausea, vomiting, and diffuse abdominal pain at least nine times just from late-2014 to late-2015: November 17-18, 2014 (AR 505); December 8, 2014 (AR 831); February 23, 2015 (AR 657); February 26, 2015 (AR 625); March 19, 2015 (AR 558); April 21, 2015 (AR 604); July 31, 2015 (AR 548); November 1, 2015 (AR 716); and November 3, 2015 (AR 806). Gastrointestinal specialist Dr. Taft Bhuket, M.D., noted that Plaintiff's condition was "lifestyle limiting and persistent" and offered a diagnostic impression of "functional abdominal disorder." (AR 668).

Although the ALJ claimed that Plaintiff's abdominal pain resolved with abstinence from alcohol and cannabis, Plaintiff's gastrointestinal specialist noted that Plaintiff's symptoms persisted despite extended abstinence from cannabis. (AR 667).

Moreover, even if Plaintiff's abdominal condition and associated nausea and vomiting were in fact exacerbated by alcohol or cannabis, this does not lead to a finding of non-severity at step two, as the Commissioner has promulgated a specific procedure for considering drug addiction and alcoholism. 42 U.S.C. § 416.935(a); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001) (remanding with instructions to consider effect of alcoholism "if and only if" claimant first found disabled via five-step inquiry).

This Commissioner's materiality analysis is undertaken only once the claimant is found disabled through the sequential evaluation. 42 U.S.C. § 416.935(a). If the claimant is first found disabled, and there is evidence of drug addiction or alcoholism, the Commissioner then "must determine whether [a claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." *Id*. In determining materiality, the Commissioner first evaluates which conditions would remain if a claimant stopped using drugs or alcohol. 42 U.S.C. § 416.935(b)(2). If the Commissioner finds that the "remaining limitations are disabling," then claimant is disabled regardless of substance use, and her drug addiction or alcoholism is not material. 42 U.S.C. § 416.935(b)(2)(ii).

The step two severity analysis and materiality analysis should not be conflated. In *Bustamante v. Massanari,* the ALJ found that plaintiff's mental health conditions were "the product and consequence of his alcohol abuse and not an independently severe or disabling impairment" and therefore were not severe at step two. 262 F.3d 949, 955 (9th Cir. 2001). The Ninth Circuit remanded, finding that, "The ALJ should have proceeded with the five-step inquiry without attempting to determine the impact of Bustamante's alcoholism on his other impairments. If, and only if, the ALJ found that Bustamante was disabled under the five-step inquiry, should the ALJ have evaluated whether Bustamante would still be disabled if he stopped using alcohol." *Id*.

Just as the ALJ in *Bustamante* erred by finding documented conditions non-severe at step two simply because they were supposedly caused by alcoholism, the ALJ here erred by finding plaintiff's abdominal condition non-severe because it was supposedly exacerbated by drinking or smoking cannabis. *Id.* Just as in *Bustamante,* the ALJ here should have considered the materiality of drug addiction or alcoholism "[i]f, and only if," she first found Plaintiff disabled via the five-step inquiry. *Id.*

**E.    The ALJ Erred by Formulating a Residual Functional Capacity that Did Not Include All Impairments**

At step five of the sequential evaluation process, the burden shifts to the Commissioner to show that there are jobs that exist in substantial numbers that an individual with the claimant's limitations could perform. *Tacket v. Apfel,* 180 F.3d 1094, 1098 (9th Cir.

1999). Where a claimant has non-exertional limitations such as pain, or impaired attention and concentration, the ALJ can meet this burden by propounding to a vocational expert ("VE") a hypothetical that is based on medical assumptions supported by substantial evidence in the record and that reflects all the claimant's limitations. *See Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995); *Magallanes*, 881 F.2d at 756 (9th Cir. 1989). The ALJ's depiction of the claimant's impairments must be "accurate, detailed, and supported by the medical record." *Tackett* 180 F.3d at 1101. An ALJ posing a hypothetical question to a vocational expert "must include all of the claimant's functional limitations, both physical and mental supported by the record." *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (internal quotations and citation omitted.)  An ALJ "need not include all claimed impairments in his hypotheticals, [but] he must make specific findings explaining his rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997).

Here, the ALJ propounded two hypotheticals. (AR 76-77). The first hypothetical asked the VE to assume an individual Plaintiff's age and education who is (1) able to understand, remember and carry out simple, routine tasks involving simple, work-related decisions; (2) able to adapt to routine workplace changes; (3) who could work in proximity to others, but with only occasional incidental interaction with others, and with no tandem tasks requiring cooperation with other workers to complete the task; and (3) who could tolerate only brief, incidental interaction with the public. (AR 76). In response to this hypothetical, the VE testified that an individual with the described limitations could perform work as a cleaner or laundry worker. (AR 76). The ALJ ultimately adopted substantially these limitations in describing Plaintiff's residual functional capacity. (AR 27).

The ALJ's second hypothetical included two additional limitations supported by the record: (1) a limitation of being "off task" ten percent of the workday and (2) a limitation of missing one day of work per month. (AR 78). The VE testified that either limitation, when added to those limitations contained in the first hypothetical, would erode the job base such that work in substantial numbers would not be available for such an individual. (AR 78-79). An

individual off task 10% of the day is "almost an hour a day" and so such a limitation would "preclude all work." (AR 78). An individual who missed one day of work per month would also not succeed as a new-hire in an unskilled, entry-level position. (AR 79).

In formulating Plaintiff's ultimate residual functional capacity, the ALJ omits both additional limitations without discussion or analysis. (AR 27). The ALJ therefore erred by not making "specific findings explaining his rationale" for omitting these limitations from Plaintiff's residual functional capacity. *Light v. Soc. Sec. Admin.,* 119 F.3d at 793.

Furthermore, had the ALJ discussed Plaintiff's limited ability to remain on task and to maintain acceptable attendance, she would have concluded that substantial evidence in the record did not support a conclusion that Plaintiff would not be "off-task" at least ten percent of the time or that he would not be likely to miss at least a day of work per month.

With regard to his ability to remain "on-task," Plaintiff testified that when he is manic "it's difficult to focus or pay attention to what needs to be done, or what people are asking me to do because it just – it's just difficult to focus with – just a lot of thoughts – racing thoughts going on in my mind and it makes it very difficult to complete any tasks." (AR 56-57). Examining psychologist Lesleigh Franklin, PhD, found that the Plaintiff had an "extreme" impairment in his ability to "complete a normal workday" without "interruptions from psychologically based symptoms." (AR 972). Dr. Franklin also found that Plaintiff had a "marked" impairment in his ability to "perform at a consistent pace without an unreasonable number and length of rest periods." (AR 972).

Importantly, even the non-examining state-agency consultants that the ALJ gave great weight found Plaintiff to be "moderately limited" in his abilities to maintain attention and concentration, to complete a normal workday without interruptions caused by psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 93-94; AR 124-125). The ALJ failed to include these limitations in Plaintiff's residual functional capacity, thereby preventing the VE's testimony from constituting substantial evidence of the existence of jobs that the Plaintiff could perform. *See Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993)

If the ALJ had included in Plaintiff's residual functional capacity "moderate" limitations on Plaintiff's abilities to (1) maintain attention and concentration, (2) work without interruption from psychological symptoms, and (3) work at a consistent pace without an unreasonable number of breaks, the ALJ would have determined that Plaintiff would be "off task" at least ten percent of the time. A "moderate" limitation is between "mild" and "marked" limitations on the "five-point rating scale" used to evaluate the effects of mental disorders on areas of mental functioning. 20 C.F.R. Part 404, Subpart P, App. 1, 12:00(F)(2). Plaintiff's limited attention, limited ability to work without interruptions, and limited ability to work at a consistent pace without excessive breaks directly implicate his capacity to remain "on-task." If "moderate" limitations in each of those three domains combined do not result at least ten percent of time spent "off-task," then there would be no difference between "no limitation," "mild limitation," and "moderate limitation." 20 C.F.R. Part 404, Subpart P, App. 1, 12(F)(2).

Regarding his likelihood of missing work unexpectedly, Plaintiff testified that there are times when he is so depressed that "it's difficult to do anything in the day, let alone just the stuff I need to do for myself." (AR 56). His mother stated that there are days when Plaintiff "stays in bed all day or for much of the day" not doing activities or eating. (AR 313). Even when Plaintiff was not too depressed to get out of bed, he required verbal and text reminders to keep his appointments. (AR 309). Again, even the state-agency consultants agreed that Plaintiff had a moderate limitation in his abilities to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" and to complete a normal workweek "without interruptions from psychologically based symptoms. (AR 93-94; AR 125). These limitations are not otherwise included or accounted for in Plaintiff's residual functional capacity as determined by the ALJ. (AR 27). If the existence of "moderate" impairments in "maintaining attendance" and "completing a workweek," means anything, then they must mean at a minimum that Plaintiff would miss a single day of work per month.

Furthermore, as the ALJ erred at step two in not finding Plaintiff's abdominal disorder with associated nausea and vomiting to be severe, she also did not include any limitations resulting from that condition in Plaintiff's residual functional capacity. (AR 27). As the ALJ

did not include all impairments in the hypothetical provided to the VE, the VE's testimony is not substantial evidence and the Commissioner has not met his burden at step five. *See Matthews* 10 F.3d at 681 ("If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.") (internal quotation marks and citation omitted).

**F.      The Court Should Remand for Payment of Benefits**

"Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). The Social Security Act, however, makes clear that courts are empowered to affirm, modify, or reverse a decision by the Commissioner, "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court may remand to an ALJ with instructions to calculate and award benefits if: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.  *Garrison*, 759 F. 3d at 1020. Once the three conditions of this "credit-as-true" rule are met, the claimant is entitled to an award of benefits unless "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled," in which case remand for further proceedings is appropriate. *Id*. at 1020-1021.

In this case, the credit-as-true rule is met. The record has been fully developed and the ALJ failed to provide legally sufficient reasons for disregarding the opinions of examining psychologist Lesleigh Franklin, for disregarding the testimony of the Plaintiff's mother, and for disregarding the testimony of the Plaintiff himself. Had the ALJ properly credited these sources she would have found that Plaintiff met Listing 12.04 for mood disorder at step three of the sequential evaluation, or in the alternative, that Plaintiff was unable to perform other work at step five. Under *Garrison*, a case should be remanded for award of benefits when the credit-as-true test is met, unless, "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." 759 F.3d 995 at 1021. In this case, the credit-as-true test is met.

There is no competent conflicting evidence, and no serious doubt that Plaintiff is disabled. Thus, remand for award of benefits is appropriate.

## XI.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully asks the Court to grant summary judgment for Plaintiff, reverse the decision of the Commissioner, and remand with instructions to award benefits pursuant to sentence four of 42 U.S.C. § 405(g). In the alternative, the Court should remand for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Respectfully submitted,

Dated: January 28, 2018                     */s/ Joseph Falcon-Freeman*

Joseph Falcon-Freeman
Attorney for Plaintiff Sean Micco